**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA LUCILLE LEHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 09-1449 |
| | ) | Judge Nora Barry Fischer |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

**I.      Introduction**

Plaintiff, Pamela L. Lehman, ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 1318-1383 (the "Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 16, 18). The record has been developed at the administrative level. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Accordingly, Plaintiff's motion for summary judgment is granted, in part, and denied, in part; Defendant's motion for summary judgment is denied; and this matter is remanded for further consideration by the ALJ.

## II.    Procedural History

On August 25, 2006, Plaintiff protectively filed an application for DIB and SSI, alleging physical impairments in her neck and left shoulder, as well as mental impairments including bipolar and anxiety disorders.  (Docket Nos. 14 through 14-6, hereinafter "R. at __"). Her claims were denied initially on February 27, 2007.  (R. at 99).  Her request for a hearing was granted and a hearing was held on July 1, 2008 before ALJ Patricia C. Henry.  (R. at 27, 85-9). Plaintiff was represented by George E. Clark, Esquire at said hearing.  (R. at 27).  ALJ Henry issued an unfavorable decision on September 3, 2008. (R. at 10-26).  On October 2, 2008, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's September 3, 2008 decision the final decision of the Commissioner. (R. at 1-4).

Plaintiff filed a Complaint regarding the denial of benefits in this Court on October 28, 2009. (Docket No. 1).  Upon review of Plaintiff's Complaint, wherein Plaintiff alleged that she was a resident of Huntington County, Pennsylvania, the Court *sua sponte* transferred the case to the United States District Court for the Middle District of Pennsylvania on October 30, 2009. (Docket No. 2).  Shortly thereafter, on November 9, 2009, Plaintiff filed a motion to reopen her case, averring that her residence is in Westmoreland County, Pennsylvania, and a motion to amend her Complaint to reflect the correct county of residence.  (Docket Nos. 3-4).  The Court granted both motions and directed Plaintiff to file an amended complaint correcting this deficiency.  (Docket Nos. 5-6).

Plaintiff filed her Amended Complaint on November 10, 2009.  (Docket No. 7).  After service was made, the Commissioner filed an Answer and the administrative record on January 11, 2010.  (Docket Nos. 13, 14).  Plaintiff filed her Motion for Summary Judgment and Brief in Support on February 10, 2010.  (Docket No. 16, 17).  In turn, the Commissioner filed his Motion

for Summary Judgment and Brief in Support on March 2, 2010. (Docket No. 18, 19).  No further briefing has been received and the parties' motions are fully briefed and ripe for disposition.

## III.    Legal Standard

Judicial review of the Commissioner's final decisions on disability claims is provided by statute.  42 U.S.C. §§ 405(g)[1] and 1383(c)(3)[2].  Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II (42 U.S.C. §§ 401- 433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding SSI), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a). *Sullivan v. Zebley,* 493 U.S. 521, 525 n. 3, 110 S.Ct. 885, 107 L.Ed.2d 967(1990); *Burns v. Barnhart,* 312 F.3d 113, 119 n. 1 (3d Cir.2002).

When reviewing a decision denying DIB and SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns,* 312 F.3d at 118. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v.*

---

[1]

> Section 405(g) provides in pertinent part:
>> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[2]

> Section 1383(c)(3) provides in pertinent part:
>> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Shalala,* 55 F.3d 900, 901 (3d Cir.1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D.Pa.1998). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir.1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. § 404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas,* 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986).

## IV.    Factual Background

### A.    General Background

Plaintiff was born on December 5, 1965, making her 40 years old as of her alleged onset date (May 1, 2006), and was 42 years old at the time of her hearing before the ALJ (July 1, 2008). (R. at 10, 110). Plaintiff has two children, ages 21 and 25, from different relationships. (R. at 219). These children are no longer dependent upon the care of their parents. (R. at 31). Plaintiff also has guardianship over her three nieces who are five, seven, and ten years old, due to her sister's incarceration and heroin addiction. (R. at 40-41, 241-242). Plaintiff plans to seek custody of the children. (*Id.*). All three girls have different fathers, one of them is blind in one eye, and another requires counseling stemming from sexual abuse. (*Id.*). Plaintiff dropped out of high school in 9th grade, but subsequently earned her GED and took some business courses at a community college in Joseph City, Missouri. (R. at 38-39). Plaintiff's past relevant work[3] includes work as a cook for an assisted living facility, clerk for a dry cleaning business, fundraiser, manager of an auto body shop, cake decorator, sales associate for various businesses, service advisor for a department store's automotive department, and a waitress at various restaurants. (R. at 160).

### B.    Plaintiff's Medical Background

---

[3]    Past relevant work is defined as work that a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to perform the work. 40 C.F.R. § 404.1560(b)(1).

In Plaintiff's initial request for benefits, she included claims related to her degenerative disc disease of the cervical spine, degenerative joint disease, and history of dislocation of the left shoulder and her mental impairments including bipolar disorder and attention deficit hyperactivity disorder. (R. at 141, 148). On appeal, Plaintiff only disputes the ALJ's decision with regard to her mental impairments, specifically her bipolar disorder.[4] (Docket No. 17 at 6-11).

1. *Westmoreland Regional Hospital Partial Hospitalization Program*

On July 10, 2006, Plaintiff was referred to the Partial Hospitalization Program ("PHP") at Westmoreland Regional Hospital in Greensburg, PA. (R. at 221). Plaintiff was admitted to the PHP to treat symptoms of "depression, anxiety, sleep disturbance, increased irritability, increased appetite, passive suicidal ideation, hyperverbal [activity], feeling out of control, increased agitation, and mood swings." (R. at 223). Upon admission, the hospital staff created an individual treatment plan for her, which included psychotherapy, stress management, medication management, and educational classes. (*Id.*). Throughout her ten day participation in the program, Plaintiff was described as labile, hyperactive, easily frustrated, and impulsive. (R.

---

[4]

The medical records presented to the ALJ regarding Plaintiff's mental impairments are as follows:

Progress notes, psychiatric evaluation, and medication records, dated 07/01/2006 to 11/01/2006 from Westmoreland Comprehensive Counseling Center
Consultative Examination Report, dated 01/22/2007, from Cynthia Peterson-Handley, Ph.D.
Mental RFC Assessment, dated 02/08/2007, from Edward Jonas, Ph.D.
Mental RFC Questionaire, dated 11/16/2007, from Jeffrey Turgeon, PA-C
Progress notes and psychiatric evaluation reviews, dated 11/16/2006 to 04/02/2008 from Excela Health Comprehensive Consuling Center
Progress notes, dated 05/05/2008 to 05/15/2008, from Comprehensive Counseling Center
Progress notes dated 12/18/06 through 6/13/08 from Dr. Michael P. Toret, M.D.

(R. at 179-191, 209-230, 241-270, 276-315, 322-336).

at 225-229). Hospital staff also noted that Plaintiff appeared to have obsessive thoughts, impaired memory, and impaired coping skills. (*Id.*).

As a part of this program, Dr. Hai Wei Wang, M.D. conducted an Outpatient Psychiatric Evaluation of Plaintiff on July 11, 2006. (R. at 218). In his evaluation, Dr. Wang notes that Plaintiff has a history of mood instability and many episodes of depression starting when she was 18 years old. (*Id.*). During these bouts of depression, Plaintiff claims she lost significant weight and contemplated suicide. (*Id.*). Plaintiff did not see a psychiatrist until 2003, and stopped seeing the psychiatrist after a few visits. (*Id.*). Plaintiff stated that her family physician prescribed her Wellbutrin[5] and Celexa[6], but she stopped taking these medications because they "seemed to make her crazy." (*Id.*).

Dr. Wang reported that Plaintiff's family has a history of psychiatric problems. Plaintiff's mother and sister both have battled heroin addiction, and her father has been treated for post-traumatic stress disorder.[7] (R. at 219). Plaintiff's cousin committed suicide at the age of 13. (*Id.*). Plaintiff was arrested for driving under the influence and subsequently lost her license, but claimed to Dr. Wang that she had no substance abuse issues and had not consumed an alcoholic beverage in the previous seven days. (*Id.*).

---

[5] "Wellbutrin is an antidepressant medication. It works in the brain to treat depression. Wellbutrin is used to treat major depressive disorder and seasonal affective disorder. At least one brand of bupropion (Zyban) is used to help people stop smoking by reducing cravings and other withdrawal effects." Drugs.com, Wellbutrin, *available at:* http://www.drugs.com/wellbutrin.html (last visited 5/16/10).

[6] "Celexa is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). It works by restoring the balance of serotonin, a natural occurring substance found in the brain, which helps to improve certain mood problems. Celexa is used to treat depression." Drugs.com, Celexa, *available at:* http://www.drugs.com/celexa.html (last visited 5/16/10).

[7] "Post-traumatic stress disorder" is the "development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria." STEDMAN'S MEDICAL DICTIONARY at 116700 (27th ed. 2000).

In addition to Plaintiff's episodes of depression, Dr. Wang stated that Plaintiff "reports a long history of impulsivity, irritability, and hyperactivity which indicates hypomanic episodes." (*Id.*). Dr. Wang further noted that Plaintiff was alert and cooperative during the interview "but she was crying, tearful, and her state of mood was depressed." (*Id.*). Dr. Wang diagnosed Plaintiff as having Bipolar II[8] disorder, most recently a depressed episode, and a Global Assessment of Functioning ("GAF") score of 50.[9] (R. at 220). Dr. Wang prescribed her Lamictal[10], starting at 25 mg/day, moving up to 50 mg/day for two weeks and then 100 mg/day after another two-week period. (*Id.*). Dr. Wang instructed Plaintiff to follow-up with the doctors at the partial hospital program, and then referred her to the outpatient clinic. (*Id.*). Ten days

---

[8]

"Bipolar disorder" is "an affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression." STEDMAN'S at 116700. "Bipolar II disorder (pronounced 'bipolar two') is a form of mental illness. Bipolar II is similar to bipolar I disorder, with moods cycling between high and low over time. However, in bipolar II disorder, the 'up' moods never reach full-on mania. The less-intense elevated moods in bipolar II disorder are called hypomanic episodes, or hypomania. A person affected by bipolar II disorder has had at least one hypomanic episode in life. Most people with bipolar II disorder also suffer from episodes of depression. This is where the term 'manic depression' comes from. In between episodes of hypomania and depression, many people with bipolar II disorder live normal lives." WebMD, Bipolar Disorder Guide, Bipolar II Disorder, *available at:* http://www.webmd.com/bipolar-disorder/guide/bipolar-2-disorder (last visited 5/16/10).

The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of between 31-40 denotes "severe symptoms" with some impairment in reality testing or major impairments in several areas. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication ...." *Id.*

[10]

"Lamictal is an anti-epileptic medication, also called an anticonvulsant. Lamictal is used alone or in combination with other medications to treat seizures in adults and children who are at least 2 years old. It is also used to delay mood episodes in adults with bipolar disorder." Drugs.com, Lamictal, *available at*: http://www.drugs.com/lamictal.html (last visited 5/16/10).

later, doctors at the PHP prescribed Plaintiff Seroquel[11] and later reduced the recommended dosage. (R. at 222).

## 2. *Comprehensive Counseling Center*

On July 28, 2006, after visiting the PHP for ten days, Plaintiff was referred to the Comprehensive Counseling Center in Westmoreland Regional hospital. (R. at 216). There, Plaintiff attended counseling sessions conducted by Diane Muka, M.A., and medication management sessions conducted by Jeff Turgeon, PA-C, who was supervised by Dr. Wang. (*Id.*)

Plaintiff first met with Mr. Turgeon on August 18, 2006. He initially reported Plaintiff's mood, anxiety, sleep, appetite, energy, motivation, socialization, and interests had improved. (R. at 215). To Mr. Turgeon, Plaintiff presented as well groomed, made good eye contact and exhibited normal motor function and a goal directed thought process. (*Id.*). But, she also appeared anxious, with an elevated affect, and exhibited an abnormal rate of speech, and abnormal insight. (*Id.*).

Plaintiff's medications have been adjusted numerous times since beginning psychiatric treatment. As previously noted, Plaintiff was initially prescribed Lamictal and Seroquel. When Plaintiff complained that she felt agitated, irritable, and emotional, Plaintiff was told to stop taking Seroquel and was prescribed Geodon[12]. (R. at 211). Plaintiff seemed to respond well to this medication, but was still extremely talkative and appeared hyperactive. (R. at 210). After

---

[11]

      Seroquel is an antipsychotic medication used to treat schizophrenia in adults and children who are at least 13 years old, as well as bipolar disorder (manic depression) in adults and children who are at least 10 years old, and major depressive disorder in adults. It works by changing the actions of chemicals in the brain. Drugs.com, Seroquel, *available at*: http://www.drugs.com/seroquel.html (last visited 5/16/10).

      "Geodon (ziprasidone) is an antipsychotic medication. It works by changing the effects of chemicals in the brain. Geodon is used to treat schizophrenia and the manic symptoms of bipolar disorder (manic depression) in adults and children who are at least 10 years old." Drugs.com, Geodon, *available at*: http://www.drugs.com/geodon.html (last visited 5/16/10).

Plaintiff complained of extreme sleepiness, she was prescribed a trial Abilify,[13] but later complained that it made her feel "like a disoriented rat in a cage." (R. at 302, 307). Dr. Wang then prescribed her Geodon again. (R. at 297). In so doing, he noted that Plaintiff admitted that she did not take her medications in a consistent way, and had a tendency to stop taking them as soon as she experiences any side effects in the initial stages of treatment. (R. at 297). Weeks later, Plaintiff complained that she experienced daytime drowsiness while taking Geodon, but Dr. Wang reminded Plaintiff that she was to take Lamictal during the day, and Geodon at night. (R. at 295). Plaintiff continued to complain of this drowsiness on September 20, 2007, and ultimately stopped taking Geodon again. She was then prescribed a trial of Strattera[14]. (R. at 290). Over the next month, Plaintiff experienced multiple negative reactions to Strattera, including fever with chills and shaking and feeling like "bugs are crawling all over her." (R. at 289). This prompted Mr. Turgeon to discuss the possibility of taking Lithium[15] and Depakote[16], but Plaintiff preferred to take an increased dosage of Lamictal (400 mg/day). (R. at 288). Three

---

[13] "Abilify (aripiprazole) is an antipsychotic medication. It works by changing the actions of chemicals in the brain. Abilify is used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression). It is also used together with other medications to treat major depressive disorder in adults. Abilify is also used to treat irritability and symptoms of aggression, mood swings, temper tantrums, and self-injury related to autistic disorder in children who are at least 6 years old." Drugs.com, Abilify, *available at*: http://www.drugs.com/abilify.html (last visited 5/16/10).

[14] "Strattera affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Strattera is used to treat attention deficit hyperactivity disorder (ADHD)." Drugs.com, Strattera, *available at*: http://www.drugs.com/strattera.html (last visited 5/16/10).

[15] "Lithium affects the flow of sodium through nerve and muscle cells in the body. Sodium affects excitation or mania. Lithium is used to treat the manic episodes of manic depression. Manic symptoms include hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression, and anger. It also helps to prevent or lessen the intensity of manic episodes." Drugs.com, Lithium, *available at*: http://www.drugs.com/lithium.html (last visited 5/16/10).

[16] Depakote is indicated for "[a]cute treatment of manic or mixed episodes associated with bipolar disorder, with"Depakote affects chemicals in the body that may be involved in causing seizures. Depakote is used to treat various types of seizure disorders. It is sometimes used together with other seizure medications. It is also used to treat the manic phase of bipolar disorders (manic-depressive illness), and to prevent migraine headaches." Drugs.com, Depakote, *available at*: http://www.drugs.com/depakote.html (last visited 5/16/10).

months later, Dr. Wang decided to try giving Plaintiff a low dose of Risperdal[17] to see how she responded. (R. at 284). Plaintiff said that she felt much calmer on the Risperdal and was much more organized in her thinking, but the medication also made her feel fatigued. (R. at 283). Dr. Wang continued Plaintiff's prescription of Risperdal, but stressed the need to continue to monitor her reaction to the medication. (R. at 282).

On November 16, 2007, Mr. Turgeon completed an RFC Questionaire with regard to Plaintiff's mental impairments. (R. at 266-70). He assessed a GAF score of 45 but also noted that Plaintiff's highest GAF in the preceding year was 55. (R. at 266). Mr. Turgeon described Plaintiff as persistently anxious, emotionally unstable, and easily distractible. (R. at 267). In assessing Plaintiff's mental abilities and aptitudes needed to perform unskilled work, Mr. Turgeon found that Plaintiff: had limited but satisfactory ability to remember work-like procedures, understand and remember very short and simple instructions and to be aware of normal hazards and to take appropriate precautions; had seriously limited ability to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in a routine work setting; and, was unable to meet competitive standards to complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes and to deal with normal work stress. (R. at 268). Mr. Turgeon

---

[17] "Risperdal is an antipsychotic medication. It is an "atypical antipsychotic". It works by changing the effects of chemicals in the brain. Risperdal is used to treat schizophrenia and symptoms of bipolar disorder (manic depression). It is also used in autistic children to treat symptoms of irritability." Drugs.com, Risperdal, *available at*: http://www.drugs.com/risperdal.html (last visited 5/16/10).

also noted that Plaintiff was unable to meet competitive standards in her ability to perform semi-skilled and skilled work; finding that she was unable to understand, remember and carry out detailed instructions, set realistic goals or make plans independently of others, or to deal with the stress of semiskilled and skilled work. (R. at 269). Finally, he found that Plaintiff had limited but satisfactory ability to interact appropriately with the general public, to maintain socially acceptable behavior, and to adhere to basic standards of neatness and cleanliness. (*Id.*).

In addition to everyday stressors like work, finances, and legal issues, an overarching theme of Plaintiff's counseling sessions with Ms. Muka are her volatile relationships with her mother, sister, and husband. (R. at 210-215, 279-310). Plaintiff's numerous conflicts with her mother stem from her mother's actions including: having affairs with all three of Plaintiff's husbands, allegedly stealing a family heirloom that belonged to Plaintiff, physically assaulting Plaintiff, and wrongfully claiming one of Plaintiff's nieces as a dependent despite the children being in Plaintiff's custody. (*Id.*). Plaintiff's conflicts with her sister stem from her sister's recurring substance abuse issues and their disagreement over who should maintain custody of the children. (*Id.*) Plaintiff's conflicts with her husband result from his infidelity, abusive behavior, and allegedly violent mood swings. (*Id.*). The couple has contemplated separation and divorce multiple times, but have remained together. (*Id.*). In a progress note dated May 15, 2008, Ms. Muka assessed Plaintiff a GAF score of 55, and indicated that her highest GAF score in the previous year was 65. (R. at 313). On that occasion, Plaintiff reported to Ms. Muka that "a good week is only 2 bad days." (*Id.*).

### 3. *Physician Records*

Plaintiff was treated by Dr. Michael P. Toret, M.D., a general physician, on multiple occasions from December 18, 2006 through June 13, 2008. (R. at 322 -336). The records

primarily relate to Plaintiff's various physical ailments, although Dr. Toret generally notes Plaintiff's mental impairments, indicating a diagnosis of bipolar on most of the notes and attention deficit disorder on a few occasions. (*Id.*). In particular, on December 18, 2006, Dr. Toret noted that Plaintiff's bipolar and attention deficit disorder were "disabling." (R. at 336). No further details were provided. (*Id.*). Later, in June 2008, he simply noted that Plaintiff's bipolar disorder was "stable." (R. at 323).

    4.  *Consultative Examination*

  On February 4, 2007, Dr. Peterson-Handley, a psychologist, conducted a mental status examination of Plaintiff at her offices in Murrysville, PA.

  She first summarized Plaintiff's family and medical history. She indicated that Plaintiff suffers from severe depression and rage, and has a history of reckless behavior, including two suicide attempts. (R. at 241). On the first occasion, Plaintiff "took a 9mm and tried to shoot herself." (*Id.*). Plaintiff tried to take her life again by driving her car into a tree. (*Id.*). At the time of the exam, Plaintiff was taking three medications: Abilify (15 mg), Lamictal (200 mg), and Vicodin[18].

  At the time of the exam, Plaintiff was clean in appearance, cooperative, and displayed no significant behavior. (*Id.*). Plaintiff described her mood as "severely depressed," and was tearful during much of the examination. (*Id.*). Dr. Peterson-Handley described Plaintiff's behavior as "appropriate," but also noted that she was "very talkative and…distressed by her husband's affair with her mother." (*Id.*). Though she does not experience hallucinations, Plaintiff experiences "bad panic attacks," where she "gets overwhelmed," can "feel it coming up

---

[18]  "Vicodin is a tablet containing a combination of acetaminophen and hydrocodone. Hydrocodone is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone. Vicodin is used to relieve moderate to severe pain." Drugs.com, Vicodin, *available at*: http://www.drugs.com/vicodin.html (last visit 5/16/10).

from [her] toes," and she "goes off on store clerks, the butcher, and others." (*Id.*). Plaintiff was productive in her thoughts and could generate ideas, feelings, and recall events, but she often went on tangents and needed to be redirected. (R. at 243). Dr. Peterson-Handley reported that Plaintiff experiences delusional thoughts that members of her family were plotting against her. (*Id.*). However, she noted that Plaintiff fared well in the other thought exercises that examined her intelligence, concentration, and abstract thinking skills. (*Id.*).

Dr. Peterson-Handley concluded that Plaintiff's long-term memory was very good as she could recall detailed information about her grandmother and other family members. (*Id.*). But, she rated Plaintiff's recent past memory as "not good," and her short-term memory as "ok." (*Id.*). She noted that Plaintiff is very impulsive, struggles to control her rage, and has a problem with authority, including that she has been in jail three times because of public drunkenness, driving under the influence and assaulting her husband with a Pringle's can. (R. at 243-44). Dr. Peterson-Handley reported that Plaintiff's social judgment is negatively affected by her anger, panic attacks and "thoughts that people are talking about her." (R. at 244). Dr. Peterson-Handley diagnosed Plaintiff with Bipolar II, most recently a depressed episode, and panic disorder (without agoraphobia). Dr. Peterson-Handley assessed Plaintiff as having a GAF score of 45, with a 'fair' prognosis." (*Id.*). Plaintiff described a typical day as "waking up with the kids, getting them off to school, cooking, cleaning, and doing laundry," she explained that she used to enjoy hunting and fishing, and likes to go to the fire hall to "play the machines." (*Id.*). Plaintiff described her concentration as "horrible," and claimed that she could no longer read novels, at one time a regular activity for her. (*Id.*). Plaintiff stated that persistence and pace depend upon her mood, whether depressed or manic. (*Id.*).

In assessing Plaintiff's work capabilities, Dr. Peterson-Handley deemed Plaintiff's ability to understand, remember, and carry out short, simple instructions to be moderately affected by her impairments, she assessed no limitations on Plaintiff's ability to make judgments on simple, work-related decisions, but she noted extreme limitations in Plaintiff's ability to understand and remember detailed instructions and to carry out same. (R. at 245). With respect to Plaintiff's abilities to interact with others, Dr. Peterson-Handley assessed Plaintiff's ability to interact appropriately with the public, supervisors, and co-workers as extremely impaired, Plaintiff's ability to respond appropriately to changes in a routine work setting were deemed moderately impaired, and Plaintiff's ability to respond appropriately to work pressures in a usual work setting was not affected by her impairments. (*Id.*). Finally, Dr. Peterson-Handley found that Plaintiff was able to manage benefits in her own best interests. (R. at 246).

5.  *Residual Functional Capacity Assessment*

On February 8, 2007, Dr. Edward Jonas, Ph.D, completed a mental residual functional capacity assessment after reviewing Plaintiff's file. (R. at 247-250). In his report, Dr. Jonas concluded that Plaintiff was only "moderately limited" by her impairment in her ability to: understand/remember/carry out detailed instructions, maintain concentration, conform to a schedule, avoid distractions from others, work at a consistent pace, interact with others, and adapt to changes in the work place. (R. at 248).

Dr. Jonas diagnosed Plaintiff as having bipolar disorder, anxiety disorder (NOS), marijuana abuse, and alcohol abuse "in no more than partial remission." (R. at 249). He noted that Plaintiff has not had any hospitalizations due to her mental impairments, but recognized that Plaintiff participated in a PHP[19] earlier in the year, and was in outpatient therapy and medication

---

[19]     *See* discussion *supra* at 6.

management classes at that time. (*Id.*). In his opinion, Plaintiff only exhibited moderate limitations in mental functioning, and demonstrated independence in her activities of daily living by caring for her three nieces and engaging in many social activities. (*Id.*). He explained that Plaintiff can understand, remember, and carry out simple instructions (one and two-step tasks), and Plaintiff can make simple decisions. (*Id.*). He acknowledged that Plaintiff's history shows a pattern of distractive behavior and difficulties in dealing with stress and interpersonal communications. (*Id.*). Dr. Jonas found Plaintiff's statements regarding her impairments to be "partially credible," and found Dr. Peterson-Handley's opinions to be inconsistent with all of the evidence, both medical and non-medical. (*Id.*). Dr. Jonas found that Dr. Peterson-Handley's opinion "relied heavily on the subjective report of symptoms and limitations provided by the [Plaintiff]," but "the totality of the evidence does not support the [Plaintiff's] subjective complaints." (R. at 249-250). In conclusion, Dr. Jonas found that "[t]he claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (R. at 250).

6. *July 1, 2008 Hearing*

A hearing regarding Plaintiff's application for Social Security benefits was held on July 1, 2008, in Johnstown, Pennsylvania before ALJ Patricia C. Henry. (R. at 29). At the hearing, Plaintiff appeared with the assistance of counsel, George Clark, Esquire (*Id.*).

Plaintiff testified that she has not worked since October of 2007, when she worked as a cook at Ye Old Country Tavern. (R. at 30). She explained that her boss fired her because she could not take and carry out instructions, and she had problems interacting with patrons. (R. at 41-42). Plaintiff stated that she has difficulties in dealing with authority, and has been in verbal altercations with customers as well as her supervisors. (R. at 42-43). When these altercations

occur, she needs to take unscheduled breaks to calm down. (R. at 42). Plaintiff's depressive cycles result in her spending three consecutive days in her room, leaving her husband to care for their three nieces. (R. at 47). Plaintiff testified that she does not go to work or keep appointments when she is in a depressed cycle, and that the symptoms of her bipolar disorder cause her to call off work once a week. (R. at 48). According to Plaintiff, the longest time she has been able to keep a job is twelve to fourteen months. (R. at 49). This is due, in large part, to her consistent absenteeism. (*Id.*).

Plaintiff explained that during her manic stages, she engages in compulsive activities, such as completely cleaning her bathroom, including pulling up the linoleum floor, only to have to get it replaced the following day. (R. at 50). Plaintiff also experiences intense emotional outbursts with people, including strangers, in everyday scenarios such as checking out at the grocery store. (R. at 54). One such incident resulted in Plaintiff not being allowed on the premises. (*Id.*). While Plaintiff's manic stages occur two times a month on average, Plaintiff's outbursts occur "several times a week." (R. at 50, 54). After these episodes, Plaintiff realizes that she has not acted appropriately, but says she cannot control these reactions. (R. at 55). On "normal days," Plaintiff engages in routine activities around the house, including: feeding the children, cleaning the house, watching television, preparing dinner, playing with the children, and doing laundry. (R. at 52). Although Plaintiff testified that she has experienced some improvement since receiving psychiatric treatment, she claims she will never improve to the point of being able to hold a regular job, stating that "if I get a job, I won't keep a job, and if I do get [a job], it's only a matter of time before I do something to destroy it." (R. at 56).

Tim Mahler, M.Ed.[20], an impartial vocational expert, also testified. (R. at 57). ALJ Henry asked Mahler whether jobs existed for a hypothetical individual with Plaintiff's age, education, and work experience who "is limited to medium work and is limited to simple, routine, repetitive tasks, not performed in a fast paced production environment, involving only simple work-related decisions, and relatively few work place changes and is limited to occasional interaction with supervisors, co-workers, and members of the general public." (R. at 58-59). Mahler identified several such jobs: material handlers, vehicle washers, janitors, and hand packers. (R. at 59). ALJ Henry then asked if jobs limited to light work were available to Plaintiff, assuming the same non-exertional limitations. (*Id.*). Mahler again listed several jobs, including labelers and markers, laundry folders, office cleaners and hand packers. (*Id.*) Mahler testified that absence from work for more than one day per month would compromise the jobs available in the competitive market. (R. at 60).

Plaintiff's counsel questioned Mahler as to whether jobs existed where there was rare contact with supervisors, co-workers, or the general public. (*Id.*). Mahler responded that vehicle washers and janitors have rare supervision or contact with other people. (*Id.*). However, where an individual could not sustain an ordinary routine without special supervision, these jobs would not be available. (R. at 61).

      7.   *ALJ's Decision*

The ALJ issued her decision on September 3, 2008, concluding that Plaintiff did not meet the requirement for receipt of disability insurance benefits because she "has not been under a

---

[20]     Plaintiff stipulated to Mr. Mahler's professional qualifications at the hearing. (R. at 57). Mahler's curriculum vitae states that he attained a Bachelor of Arts in English from Duquesne University, Pittsburgh, Pennsylvania, in 1970 and that he was awarded a Masters in Education in Counseling in 1972 from the University of Pittsburgh. (R. at 93). He is currently in the private practice of vocational rehabilitation counseling and consultation, including providing vocational expert witness testimony. (R. at 92).

disability within the meaning of the Social Security Act from May 1, 2006 through the date of this decision." (R. at 7, 10).

In her decision, the ALJ made the following determinations: (1) Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2009 (R. at 12); (2) Plaintiff had not engaged in substantial gainful activity since May 1, 2006 (*Id.*); (3) Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, degenerative joint disease and a history of dislocation of the left shoulder, and bipolar disorder (*Id.*); (4) Plaintiff did not have an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. at 13); (5) Plaintiff has the residual functional capacity to perform medium work, including simple, routine, repetitive tasks, with occasional interaction with supervisors, co-workers and members of the public, and relatively few work place changes (R. at 15); (6) Plaintiff is unable to perform any past relevant work (R. at 24); (7) Plaintiff is classified as a "younger individual" under the Social Security Act (*Id.*); (8) Plaintiff has the equivalent of a high school education and is able to communicate in English (*Id.*); (9) Transferability of job skills is immaterial to the determination of disability (*Id.*); and (10) There are jobs that Plaintiff can perform, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity (*Id.*).

The ALJ held that Plaintiff's medically determinable impairments could be reasonably expected to produce the alleged symptoms; however, "the Plaintiff's statements concerning the intensity, persistence and limited effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (R. at 20). Plaintiff's symptoms do not appear to be totally debilitating, as Plaintiff's activities of daily living are not significantly impaired. (*Id.*). In particular, the ALJ noted that Plaintiff cares for three children,

cooks, cleans, does laundry, and engages in various recreational activities. (*Id.*). Despite multiple opinions from physicians and other medical professionals to the contrary, the ALJ found that Plaintiff's activities of daily living and her GAF score of 55 in the preceding year indicated only moderate symptoms, discrediting these medical opinions. (R. at 23). As a result, she concluded that Plaintiff was not disabled under the Social Security Act and, thus, was denied disability benefits. (R. at 25).

## V.    Discussion

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because she allegedly failed to give controlling weight to the opinions of her treating physician's assistant, Mr. Turgeon, set forth in a Mental Residual Functional Capacity Questionnaire dated November 16, 2007. (Docket No. 17 at 6). She further contends that the ALJ failed to cite inconsistent medical evidence in support of "the diminished weight given to Mr. Turgeon's opinion" or to "address the substantial medical evidence that supports Mr. Turgeon's opinion," including the opinions of Dr. Wang, her treating physician, and Dr. Peterson-Handley, a consultative examiner. (*Id.*). She maintains that the ALJ's decision is not supported by substantial evidence, and requests that the matter be reversed or remanded.[21] (*Id.*). The Commissioner argues that the ALJ's opinion is supported by substantial evidence and that appropriate weight was given to Mr. Turgeon's opinion, a physician's assistant, who is a non-acceptable medical source under the applicable regulations. (Docket No. 19).

---

[21]    Plaintiff raises a number of specific challenges to the ALJ's rejection of Mr. Turgeon's opinions, including that the ALJ erred by: (1) failing to cite inconsistent medical evidence when rejecting Mr. Turgeon's opinions; (2) erroneously finding that Plaintiff never required inpatient care; (3) failing to explain how the fact that Plaintiff cared for her sister's three children is inconsistent with Mr. Turgeon's opinions; (4) relying on the fact Plaintiff had a part time job as a cook but not noting that she was fired from this position due to her inability to do the work; (5) relying on the fact that Plaintiff traveled out of state on multiple occasions; and (6) failing to specifically address Mr. Turgeon's opinion regarding Plaintiff's ability to maintain attendance and need for unscheduled breaks. (Docket No. 17). The Court considers each of these contentions within its analysis which follows.

In this Court's estimation, the ALJ did not err for refusing to give Mr. Turgeon's opinions controlling weight, as he is not a treating physician nor an acceptable medical source and the ALJ is not permitted to give controlling weight to any of his opinions. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.' *Plummer v. Apfel*, 186 F.3d at 422, 429 (3d Cir. 1999) (*quoting Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987))." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000) (additional citations omitted). Only "acceptable medical sources" can be considered treating sources whose opinions may be entitled to controlling weight. *See* SSR 06-03P. A physician assistant is not an acceptable medical source and, thus, an ALJ may not give controlling weight to an opinion proffered by a physician assistant. *See* 20 CFR §§ 404.1513(d), 416.913(d). Therefore, Mr. Turgeon's opinions cannot be given controlling weight.

However, "opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances." SSR 96-2p. Social Security Ruling 06-03p clarifies how evidence from a medical source that is not an "acceptable medical source," should be evaluated by an ALJ, including opinions and other evidence from a physician assistant such as Mr. Turgeon, SSR 06-03p. Pursuant to SSR 06-03p, the ALJ should consider the opinions from such a source and explain the weight given to these opinions. *Id*. While evidence from "'other sources' cannot establish the existence of a medically determinable impairment," "information from other sources may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id*. In

evaluating this type of evidence, the ALJ should consider the following factors, to the extent each is relevant:

> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
> • Any other factors that tend to support or refute the opinion.

*Id*. Thus, although they cannot be given "controlling weight," opinions and findings of a non-acceptable medical source should be considered in a similar manner as those made by a treating or other physician. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

In her decision, the ALJ found that Plaintiff had the residual functional capacity to perform medium work, "except for work which requires more than simple, routine, repetitive tasks, more than occasional interaction with supervisors, co-workers and members of the general public, or any exposure to the stress associated with a fast-paced production environment, more than simple, work-related decisions or, in general, more than relatively few work place changes." (R. at 15). In so finding, the ALJ classified Plaintiff under 12.04, Affective Disorders,[22] and

---

[22]

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:
...
3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And
B. Resulting in at least two of the following:

found that she met the requirements under the "A" criteria but concluded that neither the "B" nor "C" criteria were met in this case, and, thus, Plaintiff was not disabled. (R. at 19). Specifically, the ALJ concluded that Plaintiff had: mild limitations as to her activities of daily living; moderate limitations in social functioning; moderate limitations as to concentration persistence or pace, but retained the ability to perform, simple, routine, repetitive job tasks; and that she had 1-2 episodes of decompensation. (R. at 16-19). The ALJ also found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," however, the ALJ noted that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms" were not credible. (R. at 20). The ALJ's factual findings in support of each of these conclusions were primarily: Plaintiff's daily activities including her care for her nieces, her inconsistent use of medication – but multiple reports that her symptoms were controlled with proper medication and otherwise stable – and a limited number of episodes of decompensation, with no periods of inpatient treatment.

With respect to the weight given to the opinions, the ALJ noted that in November of 2007, Mr. Turgeon rated the claimant with a current GAF score of 45 and opined that she:

> was unable to deal with normal work stress, complete a normal workday/work week without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, or set realistic goals or make plans independently of others.

(R. at 22). The ALJ found that Mr. Turgeon's opinion was both internally inconsistent and "inconsistent with the totality of the evidence" in the record and afforded "diminished weight" to

---

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

C.F.R. Pt. 404, Subpt. P, App. 1, 12.04, Effective Disorders.

his opinions "insofar as [his opinions] suggest inability to perform any work activity." (R. at 23). As to internal inconsistencies, the ALJ found that while Mr. Turgeon ascribed Plaintiff with a GAF score of 45 in November of 2007, he also noted that Plaintiff's highest GAF score within the preceding year was 55. *Id.* The ALJ further found that:

> [a]s to the treating source's assessments regarding the claimant's social functioning, concentration, persistence, pace, and ability to deal with work stress, it is noted that the treating source nonetheless indicated that the claimant had a satisfactory ability to understand, remember and carry out very short and simple instructions and to remember work-like procedures. The treating source also indicated that although the claimant's ability was seriously limited, she was not precluded from sustaining an ordinary routine without special supervision, from working in coordination with or proximity to others without being unduly distracted, from making simple work-related decisions, from asking simple questions or requesting assistance, from accepting instructions and responding appropriately to criticism from supervisors, and from responding appropriately to changes in a routine work setting.

(*Id.*).

The ALJ next concluded that Mr. Turgeon's opinions, as well as the opinions of Dr. Wang, Dr. Toret and Dr. Peterson-Handley, were inconsistent with the totality of the evidence in the record and she gave "diminished weight" to each of these opinions. (R. at 22). The ALJ discredited Dr. Wang's GAF ratings of 35-50 in July 2006 because his assessment was conducted at the time that Plaintiff was initiating treatment as part of a partial hospitalization program, and was not yet taking any psychotropic medication. (*Id.*). The ALJ rejected Dr. Toret's December 2006 assessment that Plaintiff's bipolar disorder and attention deficit disorder were disabling because Dr. Toret was not a mental health specialist, and reached this conclusion after an initial examination of Plaintiff while his subsequent reports do not indicate any finding that either condition was disabling. (*Id.*). With respect to Dr. Peterson-Handley's opinions, the

ALJ discredited her assessment of a GAF score of 45 because Dr. Peterson-Handley reported that Plaintiff was only moderately restricted in her ability to understand, remember and carry out simple instructions and had no restrictions in her ability to make judgments on simple, work-related decisions and in the ability to respond appropriately to work pressures in a usual work setting. (R. at 22-3). The ALJ also dismissed Dr. Peterson-Handley's opinions regarding Plaintiff's extreme limitations in social functioning because Dr. Peterson-Handley's opinions appeared to be based not on her objective findings, but on the Plaintiff's own subjective complaints alone, and Dr. Peterson-Handley had also indicated that Plaintiff was cooperative, had an appropriate affect with no behavioral abnormalities and also reported Plaintiff's activities of daily living. (R. at 23). Finally, the ALJ concluded that all of these physician's opinions and findings were inconsistent with the "totality of the evidence." (*Id*.). The ALJ reasoned that Plaintiff had never required inpatient treatment, and had engaged in a broad range of activities including caring for her nieces, traveling out of town, planning future travel and had worked part time despite her conditions. (*Id*.).

In this Court's estimation, the ALJ erred in her consideration of Mr. Turgeon's opinions and failed to provide a sufficient explanation or evidentiary support for giving "diminished weight" to his opinions. Simply put, Mr. Turgeon's findings that Plaintiff had only moderate limitations in performing simple routine tasks, understanding simple instructions and the like– do not undermine, and are not necessarily inconsistent with, his findings that Plaintiff was unable to deal with normal work stress, complete a normal workday/workweek without interruptions from psychological symptoms, get along with co-workers, supervisors without unduly distracting them. Likewise, while the ALJ stated that she gave "diminished weight" to the opinions of Mr. Turgeon, Dr. Wang, Dr. Peterson-Handley, and Dr. Toret, she essentially

rejected each of them, and offered very little, if any, support by way of objective medical evidence for doing so.[23]   Instead, the ALJ focused her analysis on alleged inconsistencies between these opinions and other non-work related observations from these medical professionals as well as the Plaintiff's activities of daily living.   Her analysis in this regard is flawed.

It is well established that an ALJ is tasked with weighing all of the evidence of record and resolving conflicts in same. *See Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir.2000).   However, when a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993).

The Court of Appeals has recognized a distinction between a clinician's specific conclusions as to a claimant's work-related abilities and a clinician's assessment of the claimant at the time of an examination.  *See Brownawell v. Commissioner of Social Security,* 554 F.3d 352, 357 (3d Cir. 2008)(noting that a "doctor's notation that a condition is 'stable' during treatment does not necessarily support the conclusion that the patient is able to work."); *see also Morales*, 225 F.3d at 219 (a doctor's notation that a claimant is "'stable and well controlled with medication' during treatment does not support the medical conclusion that [the claimant] can return to work").   The Court of Appeals has noted that discrepancies between these types of evidence do not necessarily create a conflict and found that it is error for an ALJ to favor the latter type of evidence in contrast to the former because the examination takes place "in an

---

[23]
      The Court notes that despite the Commissioner's arguments, the record does not support a finding that the ALJ credited the opinions of Ms. Muka or Dr. Jonas (as discussed *infra*) in support of her determination that diminished weight should be given to the medical opinions of Dr. Wang, Dr. Peterson-Handley, Dr. Toret and Mr. Turgeon.  The ALJ only vaguely claims that the opinions of these medical professionals are inconsistent with the "totality of the evidence."  (R. at 23).  Further, the ALJ did not make any specific findings which would suggest that she credited the medical evidence proffered by Ms. Muka or Dr. Jonas over the evidence from Dr. Wang, Dr. Peterson-Handley, Dr. Toret and Mr. Turgeon.

environment absent of the stresses that accompany the work setting." *Morales*, 225 F.3d at 219. Yet, in this Court's estimation, the ALJ repeatedly reasons in such fashion in the present case.

It was also improper for the ALJ to reject the opinions of the consulting examiner, Dr. Peterson-Handley and Plaintiff's treating physician, Dr. Wang, in favor of her own interpretation of the medical evidence and personal observations of the Plaintiff. An ALJ may not make speculative inferences from medical reports and is not free to employ her own lay opinion against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). "The principle that an ALJ should not substitute [her] lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability" and "an ALJ's personal observations of the claimant 'carry little weight in cases ... involving medically substantiated psychiatric disability.'" *Morales*, 225 F.3d at 319 (quoting *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)). The ALJ's decision is further subject to challenge because the opinions of these physicians, particularly their opinions as to her social functioning and concentration, persistent or pace, were rejected without any supporting medical evidence. Also, the ALJ did not make any findings regarding the residual functional capacity assessment conducted by Dr. Jonas, a file examiner, who concluded that Plaintiff was not disabled without examination. Therefore, despite the Commissioner's suggestions to the contrary, this Court cannot substitute its own factual findings regarding Dr. Jonas' report in order to rectify the lack of factual findings in the ALJ's decision. *See Fargnoli*, 247 F.3d at 44 n.7 (noting that the district court cannot substitute its own factual findings to rectify a flawed decision by an ALJ). Moreover, even if this evidence was considered, the Court of Appeals has "consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the

claimant's treating physician," and that it is similarly improper to credit a non-examining physician over a physician who has examined the claimant. *Brownawell*, 554 F.3d at 357. Thus, reliance solely on the file examiner's opinion is questionable, at best.

Additionally, some of the ALJ's factual assertions, although not completely inaccurate, mislead or misconstrue the evidence of record, particularly, the ALJ's repeated reliance on the fact that Plaintiff never required inpatient treatment for her mental impairments when indeed she participated in a ten day partial hospitalization program in 2006. The ALJ also relied on the fact that Plaintiff had worked part time as a prep cook for a few months in 2007 but disregarded the Plaintiff's testimony regarding the reasons for her termination, including that she could not do the work and could not deal with her supervisors or the restaurant's patrons. (R. at 14, 17, 41-2). The ALJ made no findings as to these facts except for a general statement that the Plaintiff's credibility was questionable. (*See* R. at 20). Finally, the ALJ ignored some evidence favorable to a disability determination, including the Plaintiff's prior suicide attempts. (*See* R. at 241).

In sum, the ALJ's decision is not supported by substantial evidence because of the diminished weight given to medical opinions; the lack of factual findings in support of the diminished weight given to such opinions; the erroneous factual assertions; lack of factual findings and disregarded evidence. As this Court has found that the ALJ's decision is not supported by substantial evidence, this Court may remand for further proceedings or award benefits under section 405(g). *See* 42 U.S.C. § 405(g). In light of the aforementioned deficiencies, a remand is more appropriate. Therefore, Plaintiff's motion for summary judgment is granted to the extent that she requests that this matter be remanded.

## VI.    Conclusion

Based on the foregoing, Plaintiff's Motion for Summary Judgment [16] is GRANTED, IN PART, and DENIED, IN PART; Defendant's Motion for Summary Judgment [18] is DENIED; and, this matter is REMANDED for further consideration.   An appropriate Order follows.


_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge


Dated: May 18, 2010

cc/ecf: All counsel of record